**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; SANTA MONICA
BAYKEEPER,
         *Plaintiffs-Appellants*,

v.

COUNTY OF LOS ANGELES; LOS
ANGELES COUNTY FLOOD CONTROL
DISTRICT; MICHAEL ANTONOVICH,
in his official capacity as Supervisor;
YVONNE BURKE, in her official
capacity as Supervisor; GLORIA
MOLINA, in her official capacity as
Supervisor; ZEV YAROSLAVSKY, in
his official capacity as Supervisor;
DEAN D. EFSTATHIOU, in his official
capacity as Acting Director of Los
Angeles County Department of
Public Works; DON KNABE, in his
official capacity as Supervisor,
         *Defendants-Appellees*.

No. 10-56017

D.C. No.
2:08-cv-01467-
AHM-PLA

OPINION

On Remand From The United States Supreme Court

Filed August 8, 2013

Before: Harry Pregerson and Milan D. Smith, Jr., Circuit Judges, and H. Russel Holland, Senior District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

## SUMMARY[**]

---

### Environmental Law

On remand from the United States Supreme Court, the panel reversed the district court's grant of summary judgment and held that pollution exceedances detected at monitoring stations of the County of Los Angeles and the Los Angeles County Flood Control District were sufficient to establish the County defendants' liability as a matter of law for violations of the terms of their National Pollutant Discharge Elimination System permit issued pursuant to the Clean Water Act.

In *Los Angeles Cnty. Flood Control Dist. v. Natural Res. Def. Council, Inc.*, 133 S. Ct. 710 (2013), the Supreme Court held that a discharge of pollutants does not occur when polluted water flows from one portion of a river that is

---

[*] The Honorable H. Russel Holland, Senior District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

navigable water of the United States, through a concrete channel or other engineered improvement in the river, and then into a lower portion of the same river. The Supreme Court declined to address the plaintiffs' argument that the County defendants' monitoring data established their liability for permit violations as a matter of law. On remand, the panel held that this court's previous rejection of the plaintiffs' argument was not a final decision, nor was it law of the case.

The panel held that, under the plain language of the NPDES permit, the data collected at the monitoring stations was intended to determine whether the permittees were in compliance with the permit. Accordingly, if the District's monitoring data showed that the level of pollutants in federally protected water bodies exceeded those allowed under the permit, then, as a matter of permit construction, the monitoring data conclusively demonstrated that the defendants were not in compliance with the permit conditions and were liable for permit violations. The panel held that extrinsic considerations, including the Clean Water Act's monitoring requirements, also supported its holding. The panel remanded the case to the district court for further proceedings, including a determination of the proper remedy for the County defendants' violations.

## COUNSEL

Aaron Colangelo, Natural Resources Defense Council, Washington, D.C.; Daniel Cooper, Lawyers for Clean Water, San Francisco, California, for Plaintiffs-Appellants.

Andrea Sheridan Ordin, Judith A. Fries, Laurie Dods, Los Angeles County Department of County Counsel, Los Angeles, California; Howard Gest and David W. Burhenn, Burhenn & Gest LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Natural Resources Defense Council and Santa Monica Baykeeper (collectively, the Plaintiffs) filed suit against the County of Los Angeles and the Los Angeles County Flood Control District (collectively, the County Defendants) alleging that the County Defendants are discharging polluted stormwater in violation of the terms of their National Pollutant Discharge Elimination System (NPDES) permit, issued pursuant to the Federal Water Pollution Control Act (the Clean Water Act, Act, or CWA), 86 Stat. 816, codified as amended at 33 U.S.C. §§ 1251, *et seq.* The district court granted the County Defendants' motion for summary judgment, reasoning that Plaintiffs failed to prove that any *individual* defendant had discharged pollutants in violation of the Clean Water Act, where Plaintiffs' only evidence of violations was monitoring data taken downstream of the County Defendants' (and others') discharge points, as opposed to data sampled at the relevant

discharge points themselves. On appeal, we affirmed the district court's judgment in part and reversed in part. *Natural Res. Def. Council, Inc. v. Cnty. of L.A.*, 673 F.3d 880 (9th Cir. 2011). On January 8, 2013, the Supreme Court reversed our judgment and remanded this case to us for further proceedings. *L.A. Cnty. Flood Control Dist. v. Natural Res. Def. Council, Inc.*, 133 S. Ct. 710 (2013). On February 19, 2013, we ordered the parties to file supplemental briefs addressing the implications of the Supreme Court's ruling. Having considered the Supreme Court's ruling, the responses of the parties in their supplemental briefs, and other matters noted herein, we now conclude that the pollution exceedances detected at the County Defendants' monitoring stations are sufficient to establish the County Defendants' liability for NPDES permit violations as a matter of law. Accordingly, we once again reverse the district court's grant of summary judgment in favor of the County Defendants, and remand to the district court for a determination of the appropriate remedy for the County Defendants' violations.

## FACTUAL BACKGROUND

## I.  Stormwater Runoff in Los Angeles County

Stormwater runoff is surface water generated by precipitation events, such as rainstorms, which flows over streets, parking lots, commercial sites, and other developed parcels of land. When stormwater courses over urban environs, it frequently becomes polluted with contaminants, such as "suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used

motor oil, raw sewage, [and] pesticides[.]"[1]  *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840 (9th Cir. 2003).  This polluted stormwater often makes its way into storm drains and sewers, which "generally channel collected runoff into federally protected water bodies," *id.*, such as rivers and oceans. Consequently, stormwater runoff has been recognized as "one of the most significant sources of water pollution in the nation, at times comparable to, if not greater than, contamination from industrial and sewage sources."  *Id.* (citation omitted).

Los Angeles County (the County) is home to more than 10 million people and covers a sprawling amalgam of populous incorporated cities and significant swaths of unincorporated land.  The Los Angeles County Flood Control District (the District) is a public entity governed by the Los Angeles County Board of Supervisors and the Los Angeles County Department of Public Works.  The District comprises 84 cities and some unincorporated areas of the County.  The County and the District are separate legal entities.

---

[1] Whereas natural, vegetated soil can absorb rainwater and capture pollutants, paved surfaces and developed land can do neither.  Paved facilities with particularly high volumes of motor vehicle traffic—such as parking lots, retail gasoline outlets, and fast food restaurants—are typically responsible for producing higher concentrations of pollutants in storm water runoff.

Each city in the District operates a municipal separate storm sewer system (ms4)**[2]** that is composed of gutters, catch basins, storm drains, and pipes that collect and convey stormwater. The County also operates its own ms4 that primarily collects and conveys stormwater runoff in the unincorporated areas of the County. Each of these ms4s connects to the District's substantially larger ms4, an extensive flood-control and storm-sewer infrastructure consisting of approximately 500 miles of open channels and

---

**[2]** Federal Regulations define an ms4 as:

> a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains):
>
> (i) Owned or operated by a State, city, town, borough, county, parish, district, association, or other public body . . . having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity . . . ;
>
> (ii) Designed or used for collecting or conveying storm water;
>
> (iii) Which is not a combined sewer; and
>
> (iv) Which is not part of a Publicly Owned Treatment Works . . . .

40 C.F.R. § 122.26(b)(8). Unlike a sanitary sewer system, which transports municipal sewage for treatment at a wastewater facility, or a combined sewer system, which transports sewage and stormwater for treatment, an ms4 conveys only untreated stormwater. *See* 40 C.F.R. § 122.26(a)(7), (b)(8).

2,800 miles of storm drains. Because a comprehensive map of the County Defendants' storm sewer system does not exist, no one knows the exact size of the LA MS4[3] or the locations of all of its storm drain connections and outfalls.[4] But while the number and location of storm drains and outfalls are too numerous to catalog, it is undisputed that the LA MS4 collects and channels stormwater runoff from across the County. It is similarly undisputed that untreated stormwater is discharged from LA MS4 outfalls into various watercourses, including the Los Angeles and San Gabriel Rivers.[5] These rivers, in turn, drain into several coastal waters, including, among others, the Santa Monica Bay and the Pacific Ocean.

---

[3] Throughout this Opinion, reference is made to both "ms4" and the "LA MS4." The former is a generic reference to an individual municipal separate storm sewer system without regard to its particular location, while the latter specifically refers to the entire flood control and storm-sewer infrastructure described *supra* that exists in Los Angeles County, and which is made up of the various interconnected ms4s that are controlled by the County, the District, and the incorporated cities within the District.

[4] An "outfall" is defined as a "point source . . . at the point where a municipal separate storm sewer discharges to waters of the United States. . . ." 40 C.F.R. § 122.26(b)(9). It is estimated that the LA MS4 contains tens of thousands of outfalls where stormwater runoff is discharged into federally protected water bodies.

[5] Plaintiffs originally complained about the County Defendants' discharges into four water bodies: the Los Angeles River, the San Gabriel River, the Santa Clara River, and Malibu Creek. *See Natural Res. Def. Council*, 673 F.3d at 883. On remand to this court, however, Plaintiffs only seek review of the district court's summary judgment ruling regarding the County Defendants' discharges into the Los Angeles and San Gabriel Rivers.

## II. The County Defendants' NPDES Permit

Section 301(a) of the CWA prohibits the "discharge of any pollutant" from any "point source" into "navigable waters" unless the discharge complies with certain other sections of the CWA.**[6]** *See* 33 U.S.C. § 1311(a). One of those sections is section 402, which provides for the issuance of NPDES permits. 33 U.S.C. § 1342. In nearly all cases, an NPDES permit is required before anyone may lawfully discharge a pollutant from a point source into the navigable waters of the United States. *See Arkansas v. Oklahoma*, 503 U.S. 91, 101–02 (1992); *Environmental Law Handbook* 323 (Thomas F. P. Sullivan ed., 21st ed. 2011).

Congress has empowered the EPA Administrator to delegate NPDES permitting authority to state agencies. 33 U.S.C. § 1342(b). Pursuant to this authority, the EPA has authorized the State of California to develop water quality standards and issue NPDES permits. Pursuant to the Porter-Cologne Water Quality Control Act, California state law designates the State Water Resources Control Board and nine regional boards as the principal state agencies charged with enforcing federal and state water pollution laws and issuing

---

**[6]** A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Throughout this litigation, there has been confusion regarding whether the LA MS4 is a "point source" under the CWA. *See Natural Res. Def. Council*, 673 F.3d at 898 (accepting Plaintiffs' argument that "[u]nder the Clean Water Act, the [LA] MS4 is a 'Point Source.'"). The LA MS4 is *not* a single point source. Rather, the LA MS4 is a collection of point sources, including outfalls, that discharge into the navigable waters of the United States.

NPDES permits. *See* Cal. Water Code §§ 13000 *et seq.* The entity responsible for issuing permits in the Los Angeles area is the California State Water Resources Control Board for the Los Angeles Region (the Regional Board).

On June 18, 1990, the Regional Board first issued an NPDES permit (the Permit) regulating stormwater discharges by the County, the District, and the 84 incorporated municipalities in the District (collectively, the Permittees). The Permit has subsequently been renewed or amended several times, and the version of the Permit at issue in this litigation came into force on December 13, 2001.[7] The Permit covers all relevant discharges that occur "within the boundaries of the Permittee municipalities . . . over which [the municipalities have] regulatory jurisdiction as well as unincorporated areas in Los Angeles County within the jurisdiction of the Regional Board."

The Permit runs to 99 pages and contains a myriad of rules, regulations, and conditions regarding the Permittees' operation of the LA MS4. However, only two sets of the Permit's provisions are particularly relevant to this appeal; those contained in Part 2, titled "Receiving Water Limitations," and those contained in the section titled "Monitoring and Reporting Program."

Part 2 places limits on the type and amount of pollutants the Permittees may lawfully discharge from the LA MS4. Specifically, Part 2 prohibits "discharges from the [LA] MS4 that cause or contribute to the violation of the Water Quality

---

[7] On November 8, 2012, the Regional Board issued a new NPDES permit to the County Defendants and various other permittees.

Standards or water quality objectives.'"[8]  The Permit defines "Water Quality Standards and Water Quality Objectives" as "water quality criteria contained in the Basin Plan, the California Ocean Plan, the National Toxics Rule, the California Toxics Rule, and other state or federal approved surface water quality plans."[9]  Succinctly put, the Permit incorporates the pollution standards promulgated in other agency documents such as the Basin Plan, and prohibits stormwater discharges that "cause or contribute to the violation" of those incorporated standards.  The Permit further provides that the Permittees "shall comply" with the LA MS4 discharge prohibitions outlined in Part 2 "through timely implementation of control measures and other actions to reduce pollutants in the[ir LA MS4] discharges . . . ."

The Monitoring and Reporting Program complements Part 2.  Under that program, the Permittees are required to monitor the impacts of their LA MS4 discharges on water quality and to publish the results of all pollution monitoring at least annually.  The primary objectives of the monitoring program include "assessing compliance" with the Permit, "measuring and improving the effectiveness" of the Los Angeles Countywide Stormwater Quality Management

---

[8] Part 2 also mandates that "[d]ischarges from the [LA] MS4 of storm water, or non-storm water, for which a Permittee is responsible for [sic], shall not cause or contribute to a condition of nuisance."

[9] Under California law, regional boards are required to formulate water quality plans, called "basin plans," which designate the beneficial uses of protected water bodies within the boards' jurisdiction, establish water quality objectives for those water bodies, and establish a program for implementing the basin plan. *See City of Burbank v. State Water Res. Control Bd.*, 108 P.3d 862, 865 (Cal. 2005) (citing Cal. Water Code § 13050(j)).

Program (SQMP),**[10]** and assessing the environmental impact of urban runoff on the receiving waters in the County.

One of the principal ways the Permittees are required to monitor their LA MS4 discharges is through mass-emissions monitoring. Mass-emissions monitoring measures all constituents present in water, and the readings give a cumulative picture of the pollutant load in a waterbody. The Permit requires the District, as Principal Permittee, to conduct mass-emissions monitoring at seven enumerated monitoring stations located throughout the County. The District is also responsible for analyzing the resulting data and submitting a comprehensive report of its findings.**[11]** According to the Permit, the purpose of mass-emissions monitoring is to: (1) estimate the mass emissions from the LA MS4; (2) assess trends in the mass emissions over time; and (3) determine if the LA MS4 is contributing to exceedances of Water Quality Standards by comparing the monitoring results to the applicable pollution standards promulgated in the Basin Plan and similar documents.

The Permittees sited a mass-emissions monitoring station in both the Los Angeles and San Gabriel Rivers (collectively, the Monitoring Stations). The Los Angeles River monitoring station is located in a channelized portion of the Los Angeles

---

**[10]** The Permit defines the SQMP as "the Los Angeles Countywide Stormwater Quality Management Program, which includes descriptions of programs, collectively developed by the Permittees in accordance with the provisions of the NPDES permit, to comply with applicable federal and state law. . . ."

**[11]** The District publishes these "Stormwater Monitoring Reports" on the internet at: http://ladpw.org/wmd/NPDES/report_directory.cfm. (last accessed August 1, 2013).

River that runs through the City of Long Beach.**¹²**  The San Gabriel River monitoring station is located in a channelized portion of the San Gabriel River that runs through the City of Pico Rivera.   The Monitoring Stations are located downstream of numerous LA MS4 outfalls controlled by the County Defendants and various other non-party Permittees.

Between 2002 and 2008, when this case was filed, the District published annual monitoring reports that contain the data that the District collected at the Monitoring Stations. According to those reports, the Monitoring Stations identified 140 separate exceedances of the Permit's water quality standards, including excessive levels of aluminum, copper, cyanide, zinc, and fecal coliform bacteria in both the Los Angeles and San Gabriel Rivers.  The County Defendants do not dispute the accuracy of the monitoring data.

---

**¹²** In a declaration submitted to the district court, the County Defendants described both Monitoring Stations as being located "in a portion of the District's flood control channel."    *See also "*Section Two: Site Descriptions," Los Angeles Cnty. Dept. of Pub. Works, *available at* http://dpw.lacounty.gov/wmd/npdes/9899_report/SiteDesc.pdf   (last accessed August 1, 2013).   Thus, it appears that the pertinent river segments are part of *both* the LA MS4 itself *and* "the waters of the United States" that the CWA protects.   But regardless of whether the mass-emissions monitoring stations are *also* part of the LA MS4, there is no dispute that the mass-emissions monitoring stations are located *within* the Los Angeles and San Gabriel Rivers, downstream of a significant number of the County Defendants' LA MS4 outfalls.  We misconstrued some of the data before us when we previously held otherwise. *See Natural Res. Def. Council*, 673 F.3d at 899 ("As a matter of law and fact, the [LA] MS4 is distinct from the two navigable rivers; the [LA] MS4 is an intra-state man-made construction—not a naturally occurring Watershed River"); *see also* 53 Fed. Reg. 49,416, 49,453 (Dec. 7, 1988) (EPA observes that "[i]n many situations, waters of the United States that receive discharges from municipal storm sewers can be mistakenly considered to be part of the storm sewer system.").

## PROCEDURAL BACKGROUND

Using the monitoring data self-reported by the District, Plaintiffs cataloged the water quality exceedances measured in various receiving waters in the County. Beginning on May 31, 2007, Plaintiffs sent a series of notice letters to the County Defendants informing them that Plaintiffs believed that they were violating the terms of the Permit.[13] Specifically, Plaintiffs contended that the water quality exceedances documented in the District's monitoring reports demonstrated liability under the CWA. Dissatisfied with the County Defendants' response to these letters, Plaintiffs brought this citizen-enforcement action on March 3, 2008. After the district court dismissed certain elements of the Plaintiffs' initial complaint because notice of the Permit violations was defective, Plaintiffs sent the County Defendants an adequate notice letter on July 3, 2008.

Plaintiffs filed their First Amended Complaint on September 18, 2008. In the complaint, Plaintiffs asserted six causes of action under the CWA. Four of the Plaintiffs' claims, which the district court designated the "Watershed Claims," were initially before us on appeal. The first three Watershed Claims allege that, beginning in 2002 or 2003, the County Defendants caused or contributed to exceedances of water quality standards in the Santa Clara River (Claim 1), the Los Angeles River (Claim 2), and the San Gabriel River (Claim 3), in violation of 33 U.S.C. §§ 1311(a), 1342(p). The fourth Watershed Claim alleges that, beginning in 2002, County Defendants caused or contributed to exceedances of

---

[13] The CWA requires plaintiffs to provide 60 days notice to an alleged violator, the State in which the violation is alleged to be occurring, and the EPA, before filing suit. 33 U.S.C. § 1365(b)(1)(A).

the water quality standards and violated the total maximum daily load limits in Malibu Creek.  All of the Watershed Claims rest on the same premise: (1) the Permit incorporates water-quality limits for each receiving water body; (2) mass-emissions monitoring stations have recorded pollutant loads in the receiving water bodies that exceed those permitted under the relevant standards; (3) an exceedance constitutes non-compliance with the Permit and, thereby, the Clean Water Act; and (4) County Defendants, as holders of the Permit and joint operators of the LA MS4, are liable for these exceedances under the Act.

Early in the litigation, the district court bifurcated liability and remedy, and all proceedings related to remedy were stayed until liability was determined.  On March 2, 2010, the district court denied all parties' cross-motions for summary judgment with regard to liability.  *NRDC v. Cnty. of L.A.*, No. CV 08-1467-AHM, 2010 WL 761287 (C.D. Cal. Mar. 2, 2010), *amended on other grounds*, 2011 WL 666875 (C.D. Cal. Jan. 27, 2011).  Although the district court accepted Plaintiffs' arguments that the Permit "clearly prohibits 'discharges from the [LA] MS4 that cause or contribute to the violation of Water Quality Standards or water quality objectives,'" 2010 WL 761287, at *6, and that mass-monitoring stations "are the proper monitoring locations to determine if the [LA] MS4 is contributing to exceedances" of the Water Quality Standards or water quality objectives, *id.*, the district court held that Plaintiffs were improperly attempting to use the District's self-reported monitoring data to establish liability without presenting evidence that any individual defendant was discharging pollutants that "cause[d] or contribute[d] to the violation" of the water quality standards.  *Id.*  The district court observed that although "the District is responsible for the pollutants in the

[LA] MS4" at the time they pass the Monitoring Stations, "that does not necessarily determine the question of whether the water passing by these points is a 'discharge' within the meaning of the Permit and the Clean Water Act." *Id.* at \*7. Unable to determine whether any of the County Defendants' upstream LA MS4 outflows were contributing polluted stormwater to navigable waters, the district court stated that "Plaintiffs would need to present some evidence (monitoring data or an admission) that some amount of a standards-exceeding pollutant is being discharged through at least one District outlet." *Id.* at \*8.

Following supplemental briefing, the district court again determined that "Plaintiffs failed to present evidence that the standards-exceeding pollutants passed through the Defendants' [LA] MS4 *outflows* at or near the time the exceedances were observed. Nor did Plaintiffs provide any evidence that the mass emissions stations themselves are located at or near a Defendant's outflow." The district court thus entered summary judgment for the County Defendants on the Watershed Claims.

On June 9, 2010, the district court entered a partial final judgment on the Watershed Claims under Fed. R. Civ. P. 54(b). The court reasoned that an interlocutory appeal was appropriate because the Watershed Claims are "factually and legally severable" from the Plaintiffs' other claims and "[t]he parties and the Court would benefit from appellate resolution of the central legal question underlying the watershed claims: what level of proof is necessary to establish defendants' liability." The Plaintiffs timely appealed.

On appeal, the Plaintiffs pressed the same legal argument they advanced in the district court: that the data published in

the County Defendants' annual monitoring reports—data which shows undisputed pollution exceedances at the mass-emissions monitoring stations—conclusively establishes the County Defendants' liability for Permit violations as a matter of law. Like the district court, we rejected this contention and held that the Plaintiffs must submit at least some additional proof of the County Defendants' *individual* contributions to the measured Permit violations. *See Natural Res. Def. Council*, 673 F.3d at 898 (noting that "the Clean Water Act does not prohibit 'undisputed' exceedances; it prohibits 'discharges' that are *not* in compliance with the Act. . . . While it may be undisputed that exceedances have been detected, responsibility for those exceedances requires proof that some entity discharged a pollutant.").

Nonetheless, we held the District liable for CWA violations in the Los Angeles and San Gabriel Rivers because we concluded that the mass-emissions monitoring stations for each river are "located in a section of the [LA] MS4 owned and operated by the District" and that "when pollutants were detected, they had not yet exited the point source into navigable waters." *Id.* at 899. We further clarified that "[t]he [relevant] discharge from a point source occurred when the still-polluted stormwater flowed out of the concrete channels where the Monitoring Stations are located, through an outfall, and into the navigable waterways. We agree with Plaintiffs that the precise location of each outfall is ultimately irrelevant because there is no dispute that [the LA] MS4 eventually adds stormwater to the Los Angeles and San Gabriel Rivers downstream from the Monitoring Stations." *Id.* at 900.

On October 11, 2011, the District filed a petition for writ of certiorari, 2011 WL 4874090, which was granted in part on June 25, 2012. *L.A. Cnty. Flood Control Dist. v. Natural Res.*

*Def. Council*, *Inc.*, 133 S. Ct. 23 (2012).  The Supreme Court granted review in order to answer a single question: "Under the CWA, does a discharge of pollutants occur when polluted water flows from one portion of a river that is navigable water of the United States, through a concrete channel or other engineered improvement in the river, and then into a lower portion of the same river?"  *L.A. Cnty. Flood Control Dist.*, 133 S. Ct. at 712–13 (internal quotation marks omitted).  The Court answered in the negative, and re-affirmed its holding in *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004), that "pumping polluted water from one part of a water body into another part of the same body is not a discharge of pollutants under the CWA."  *L.A. Cnty. Flood Control Dist.*, 133 S. Ct. at 711.  The Court did not address any other basis for the District's potential liability for Permit violations and instead reversed our prior judgment and remanded this case to us for additional proceedings.  *Id.* at 713–14.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.  We review the district court's grant of summary judgment de novo.  *Assoc. to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002).

## DISCUSSION

### I.

Plaintiffs return from the Supreme Court with the same argument they have consistently advanced throughout this litigation—that the County Defendants' monitoring data establishes their liability for Permit violations as a matter of

law. We previously rejected this argument, *see Natural Res. Def. Council*, 673 F.3d at 898, and the Supreme Court explicitly declined to address it.[14]

On remand, the County Defendants argue that we may not reconsider our earlier decision because it has become "final," and because "reconsideration of Appellants' monitoring argument would fly in the face of the finality given to decisions of this Court after denial of rehearing or expiration of the time in which to seek such further review." Alternatively, the County Defendants argue that our earlier disposition should be left undisturbed because it has become the law of the case. The County Defendants are mistaken on both counts.

"No opinion of this circuit becomes final until the mandate issues[.]" *Carver v. Lehman*, 558 F.3d 869, 878 (9th Cir. 2009); *see also* Fed R. App. P. 41(c), 1998 Adv. Comm. Note ("A court of appeals' judgment or order is not final until issuance of the mandate[.]"). Thus, we have explained that a "court of appeals may modify or revoke its judgment at any time prior to issuance of the mandate, sua sponte or by motion of the parties." *United States v. Foumai*, 910 F.2d 617, 620 (9th Cir. 1990). The mandate in this case has not issued. Consequently, our earlier judgment is not final. *Carver*, 558 F.3d at 878. Nor can it be considered the law of

---

[14] *See L.A. Cnty. Flood Control Dist.*, 133 S. Ct. at 713–14 ("Under the permit's terms, the NRDC and Baykeeper maintain, the exceedances detected at instream monitoring stations are by themselves sufficient to establish the District's liability under the CWA for its upstream discharges. This argument failed below. It is not embraced within, or even touched by, the narrow question on which we granted certiorari. We therefore do not address, and indicate no opinion on, the issue NRDC and Baykeeper seek to substitute for the question we took up for review.").

the case. *See id.* at 878 n.16 ("[U]ntil the mandate issues, an opinion is not fixed as settled Ninth Circuit law, and reliance on the opinion is a gamble." (citation omitted)); *see also Key Enters. of Del., Inc. v. Venice Hosp.*, 9 F.3d 893, 898 (11th Cir. 1993) ("[B]ecause the panel's mandate had not issued, the panel's decision was never the 'law of the case.'"). Put simply, we are free to reconsider the merits of Plaintiffs' argument, and we now do so.

## II.

Where a permittee discharges pollutants in compliance with the terms of its NPDES permit, the permit acts to "shield" the permittee from liability under the CWA. 33 U.S.C. § 1342(k). The permit shield is a major benefit to a permittee because it protects the permittee from any obligation to meet more stringent limitations promulgated by the EPA unless and until the permit expires. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 266–69 (4th Cir. 2001); *see also The Clean Water Act Handbook* 67 (Mark A. Ryan ed., 3rd ed. 2011). Of course, with every benefit comes a cost: a permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1138 (9th Cir. 1998); *see also* 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action"); *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) (noting that "[t]he plain language of [the CWA citizen suit provision] authorizes citizens to enforce *all* permit conditions"); *Environmental Law Handbook* 327 ("The

primary purpose of NPDES permits is to establish enforceable effluent limitations.").

Plaintiffs allege that the County Defendants are violating the terms of the Permit by discharging pollutants into the Los Angeles and San Gabriel Rivers in excess of the permitted levels. County Defendants do not dispute that they are discharging pollutants from the LA MS4 into these rivers. Nor can the County Defendants dispute that their own monitoring reports demonstrate that pollution levels recorded at the Monitoring Stations are in excess of those allowed under the Permit. Rather, the County Defendants focus on their perception of the evidentiary burden Plaintiffs must satisfy in order to hold any individual defendant liable for these pollution exceedances. Plaintiffs contend that they may rely exclusively on the District's monitoring reports to establish liability. County Defendants, however, argue that they cannot be held liable for Permit violations based solely on the data published in the District's monitoring reports because: (1) the mass-emissions monitoring required under the Permit was "neither designed nor intended" to measure the compliance of any Permittee; and (2) the monitoring data cannot parse out precisely *whose* discharge(s) contributed to any given exceedance because the Monitoring Stations sample pollution levels downstream from a legion of discharge points (*e.g.*, LA MS4 outfalls) controlled by various Permittees and other non-party entities, as opposed to at the discharge points themselves.

To resolve the parties' contentions, we must interpret the language of the Permit. Although the NPDES permitting scheme can be complex, a court's task in interpreting and enforcing an NPDES permit is not—NPDES permits are treated like any other contract. *See Nw. Envtl. Advocates*,

56 F.3d at 982 ("We review the district court's interpretation of the 1984 permit as we would the interpretation of a contract or other legal document.").**[15]** If the language of the permit, considered in light of the structure of the permit as a whole, "is plain and capable of legal construction, the language alone must determine the permit's meaning." *Piney Run Pres. Ass'n*, 268 F.3d at 270 (citation omitted). If, however, the permit's language is ambiguous, we may turn to extrinsic evidence to interpret its terms. *Id.* Our sole task at this point of the case is to determine what Plaintiffs are required to show in order to establish *liability* under the terms of *this particular* NPDES permit.**[16]**

## A. The Plain Language of the Permit

"[NPDES permit] terms are to be given their ordinary meaning, and when the terms of a [permit] are clear, the intent of the parties must be ascertained from the [permit]

---

**[15]** *See also Piney Run Pres. Ass'n*, 268 F.3d at 269–70; *Am. Canoe Ass'n, Inc. v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 42 (D.D.C. 2004).

**[16]** The question before us is not whether the Clean Water Act mandates any particular result. An NPDES permitting authority has wide discretion concerning the terms of a permit. It could, for example, lawfully write an ms4 permit that provides that all permittees will share liability in some ratio for any measured exceedance of applicable pollutant limits. Or, as a further example, a permitting authority could lawfully write a permit providing that only the co-permittee(s) whose specific discharges are connected to a particular pollutant exceedance may be held liable for the permit violation. *See* 33 U.S.C. § 1342(a)(2) ("The Administrator shall prescribe conditions for [NPDES] permits to assure compliance with the requirements of [33 U.S.C. § 1342(a)(1)], including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.").

itself." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). Plaintiffs argue that the text of the County Defendants' Permit is clear, and provides that the District's mass-emissions monitoring data will be used to assess the County Defendants' compliance with the Permit, and particularly Part 2, which prohibits "discharges from the [LA] MS4 that cause or contribute to the violation of Water Quality Standards or water quality objectives." The County Defendants dispute this notion, and first claim that the District's mass-emissions monitoring is intended to serve only a hortatory purpose. As County Defendants state, "the mass emission monitoring program . . . neither measures nor was designed to measure any individual permittee's compliance with the Permit." This argument is clearly belied by the text of the Permit and is rejected.

The Permit establishes a "Monitoring and Reporting Program" with the stated objectives of *both* characterizing stormwater discharges *and* assessing compliance with water-quality standards. The Permit language could not be more explicit in this regard, stating that "[a]ssessing compliance with this [Permit]" is one of the "primary objectives of the Monitoring Program." "The fact that the parties dispute a [permit's] meaning does not establish that the [permit] is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Klamath Water Users Protective Ass'n*, 204 F.3d at 1210. No reasonable person could find even the slightest ambiguity in the phrase "[t]he primary objectives of the Monitoring Program include, but are not limited to: Assessing compliance with this [Permit]." Consequently, we decline to embrace the County Defendants' initial argument that "the mass-emission monitoring stations, as a matter of fact, do not assess the compliance of any permittee with the Permit . . . ."

County Defendants' alternative argument, while more facially appealing, fares no better. Specifically, the County Defendants point to certain Permit language they claim shows that the Regional Board did not intend for the mass–emissions monitoring data to be used to establish liability for Permit violations. For instance, the County Defendants note that the Permit provides that "[e]ach permittee is responsible only for a discharge for which it is the operator." County Defendants also cite language in Part 2 that reads: "Discharges from the [LA] MS4 of storm water, or non-storm water, *for which a Permittee is responsible* for [sic], shall not cause or contribute to a condition of nuisance." The County Defendants read this language as precluding a finding of liability against them—or any other Permittee—without independent monitoring data establishing that discharges from a particular entity's ms4 outfalls exceeded standards.

"[A] court must give effect to every word or term" in an NPDES permit "and reject none as meaningless or surplussage. . . ." *In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001) (quotations omitted); *see also* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). "Therefore, we must interpret the [Permit] in a manner that gives full meaning and effect to all of the [Permit's] provisions and avoid a construction of the [Permit] that focuses only on" a few isolated provisions. *In re Crystal Props.*, 268 F.3d at 748.

The County Defendants' interpretation of the Permit ultimately must be rejected because it would create an

unreasonable result.    Reading the clause that "[e]ach permittee is responsible only for a discharge for which it is the operator" to preclude use of the mass–emission monitoring data to "assess[] compliance with this [Permit]" would render the monitoring provisions of the Permit largely meaningless.  Under the County Defendants' reading of the Permit, individual Permittees could discharge an unlimited amount of pollutants from the LA MS4 but never be held liable for those discharges based on the results of the mass–emissions monitoring, even though that monitoring is explicitly intended to assess whether Permittees are in compliance with Part 2's discharge limitations.   We are unwilling to accept such a strained interpretation.   *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (holding that courts should be guided by the "cardinal principle of contract construction: that a document should be read to give effect to all of its provisions and to render them consistent with each other").  A better reading of the Permit's putatively conflicting provisions, therefore, is the one proposed by Plaintiffs.    Limiting a Permittee's responsibility to "discharge[s] for which it is the operator" applies to the appropriate *remedy* for Permit violations, not to *liability* for those violations.  Indeed, Plaintiffs' reading is consistent with the remedial scheme of the Permit itself.  If the LA MS4 is found to be contributing to water quality violations, each Permittee must take appropriate remedial measures with respect to its *own* discharges.[17]  Thus, a finding of *liability* against the County Defendants would not, as

---

[17] The relevant Permit provision states:  "Each Permittee is required to comply with the requirements of this Order applicable to discharges within its boundaries . . . and not for the implementation of the provisions applicable to the Principal Permittee or other Permittees."

defendants argue, hold any County Defendant responsible for discharges for which they are not "the operator."

In sum, and contrary to the County Defendants' contentions, the language of the Permit is clear—the data collected at the Monitoring Stations is intended to determine whether the Permittees are in compliance with the Permit. If the District's monitoring data shows that the level of pollutants in federally protected water bodies exceeds those allowed under the Permit, then, as a matter of permit construction, the monitoring data conclusively demonstrate that the County Defendants are not "in compliance" with the Permit conditions. Thus, the County Defendants are liable for Permit violations.

## B. Extrinsic Considerations

Although we believe the plain language of the Permit clearly contemplates that the County Defendants' monitoring data will be used to assess Permit compliance (*i.e.*, establish liability for CWA violations), we note that numerous extrinsic considerations also undercut the County Defendants' position.

First and foremost, the Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit. 33 U.S.C. § 1342(a)(2); 40 C.F.R. § 122.44(i)(1) ("[E]ach NPDES permit shall include conditions meeting the following . . . monitoring requirements . . . to assure compliance with permit limitations."). That is, an NPDES permit is unlawful if a permittee is not required to effectively monitor its permit

compliance. *See* 40 C.F.R. § 122.26(d)(2)(i)(F) ("Permit applications for discharges from large and medium municipal storm sewers . . . shall include . . . monitoring procedures necessary to determine compliance and noncompliance with permit conditions . . . ."). As previously noted, the County Defendants contend that the mass–emissions monitoring program "neither measures nor was designed to measure any individual permittee's compliance with the Permit." But if the County Defendants are correct, the Permit would be unlawful under the CWA. We must interpret the provisions of the Permit like any other contract and reject an interpretation that would render the Permit unenforceable. *See Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) (noting that "contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable"); *see also Nw. Envtl. Advocates*, 56 F.3d at 984; Restatement (Second) of Contracts § 203.

Second, the County Defendants' position has been explicitly rejected by the Regional Board, the entity that issued the Permit. This is important because one of our obligations in interpreting an NPDES permit is "to determine the intent of the permitting authority. . . ." *Piney Run Pres. Ass'n*, 268 F.3d at 270. Thus, we give significant weight to any extrinsic evidence that evinces the permitting authority's interpretation of the relevant permit. *See Nw. Envtl. Advocates*, 56 F.3d at 985 (relying on "significant evidence from [the state permitting agency], the permit author," to determine the proper scope of an NPDES permit).

Here, the record contains an amicus brief filed by the Regional Board in a lawsuit nearly identical to this one.[18]  In that suit, these same Plaintiffs sued the City of Malibu, one of the County Defendants' co-permittees, for violating the NPDES Permit at issue in this case.  In its brief, the Regional Board stated its position that:

> The Permit recognizes that the inter-connected nature of the system means that it may be difficult to determine exactly where [pollutants] originated within the [LA] MS4. This does not mean, however, that the Permit assumes only one permittee may be responsible.  Instead, it recognizes that in such an integrated storm sewer system, one or more Permittees may have caused or contributed to violations. . . .  Having constructed a joint sewer system that, by design, co-mingles the [Permittees'] discharges, they cannot avoid enforcement because one cannot determine the original source of pollutants in the waste stream.

The Regional Board also noted that "the monitoring program that the permittees requested (and were granted) does not readily generate the permittee–by–permittee outfall data that the [County Defendants] would require as a precondition to enforcement."  As a result, the Regional Board disagreed with any construction of the Permit that would require individualized proof of a Permittees' discharges in order to establish liability.  Simply put, the

---

[18] *Santa Monica Baykeeper*, *et al. v. City of Malibu*, No. CV-08-01465 (AHM) (C.D. Cal. Mar. 3, 2008).

Regional Board indicated that it "does not agree" that the "burden [of proving Permit violations] rests upon the enforcing entity." Although we do not defer to the Regional Board's interpretation of the Permit, *see Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997), its rejection of the County Defendants' position is clearly instructive.

Finally, the County Defendants' arguments run counter to the purposes of the CWA, and ignore the inherent complexity of ensuring an ms4's compliance with an NPDES permit that covers thousands of different point sources and outfalls. As we have previously recognized, "[t]he NPDES program fundamentally relies on self-monitoring." *Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1491 (9th Cir. 1987), *vacated and remanded on other grounds*, 485 U.S. 931 (1988), *and reinstated and amended by* 853 F.2d 667 (9th Cir. 1988). Congress' purpose in adopting this self-monitoring mechanism was to promote straightforward enforcement of the Act. *See id.* at 1492 (noting that Congress wished to "avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay") (quoting S. Rep. No. 92–414, 92nd Cong., 1st Sess. 64, *reprinted in* 1972 U.S. Code Cong. & Ad. News 3668, 3730)).[19] Or, as one treatise writer has described enforcement of the Act:

> The CWA is viewed by many as the easiest of the federal environmental statutes to enforce. This is because persons regulated under the

---

[19] *See also* 44 Fed. Reg. 32,854, 32,863 (June 7, 1979) ("Congress intended that prosecution for permit violations be swift and simple.").

act normally must report their own compliance and noncompliance to the regulating agency. For example, holders of NPDES permits must file periodic discharge monitoring reports (or DMRs), which must contain the results of all monitoring of discharges, and must indicate where those discharges exceed permit limitations. . . . Thus, enforcement actions may be brought based on little, if anything, more than the DMRs and other reports submitted by the permittee itself.

*Environmental Law Handbook* at 357–58.

Admittedly, regulating pollution from ms4s is substantially more complicated than regulating pollution from a few defined point sources. Like the LA MS4 at issue here, municipal separate storm sewer systems often cover many square miles and comprise numerous, geographically scattered, and sometimes uncharted sources of pollution, including streets, catch basins, gutters, man-made channels, and storm drains. Faced with the difficult task of regulating millions of storm-sewer point sources, Congress amended the CWA in 1987 to grant the EPA the express authority to create a separate permitting program for ms4s. 33 U.S.C. § 1342(p)(2), (3). In enacting these amendments, Congress recognized that for large urban areas like Los Angeles, ms4 permitting cannot be accomplished on a source-by-source basis. The amendments therefore give the EPA, or a state like California to which the EPA has delegated permitting authority, broad discretion to issue permits "on a system-wide or jurisdiction-wide basis," 40 C.F.R. § 122.26(a)(1)(v), rather than requiring cities and counties to obtain separate

permits for millions of individual stormwater discharge points. This increased flexibility is crucial in easing the burden of issuing stormwater permits for both permitting authorities and permittees.[20]

But while otherwise more flexible than the traditional NPDES permitting system, nothing in the ms4 permitting scheme relieves permittees of the obligation to monitor their compliance with their NPDES permit in some fashion. *See* 33 U.S.C. § 1342(a)(2) ("The Administrator shall prescribe conditions for [NPDES] permits to assure compliance with the requirements of [the permit], including conditions on data and information collection, reporting, and such other requirements as he deems appropriate."); 40 C.F.R. § 122.44(i)(1) (establishing that every permit "shall include" monitoring "[t]o assure compliance with the permit limitations"). Rather, EPA regulations make clear that while ms4 NPDES permits need not require monitoring of each stormwater source at the precise point of discharge, they may instead establish a monitoring scheme "sufficient to yield data which are *representative of the monitored activity. . . .*" 40 C.F.R. § 122.48(b) (emphasis added). In fact, EPA regulations require permittees, like the County Defendants here, to propose a "monitoring program for *representative data collection* for the term of the permit that describes the location of outfalls or field screening points to be sampled (*or the location of instream stations*)" and explain "why the

---

[20] *See* 55 Fed. Reg. 47,990, 48,046 (Nov. 16, 1990) (noting that issuing individual permits to cover all ms4 discharges to the waters of the United States is "unmanageable"); *id.* at 48,049–48,050 ("Given the complex, variable nature of storm water discharges from municipal systems, EPA favors a permit scheme where the . . . [p]ermit writers have the necessary flexibility to develop monitoring requirements that more accurately reflect the true nature of highly variable and complex discharges.").

[chosen] location is *representative*. . . ."    40 C.F.R.
§ 122.26(d)(2)(iii)(D) (emphases added).  Here, the County
Defendants did just that.  County Defendants themselves
chose the locations of the Monitoring Stations, locations that
are downstream from a significant number of their outfalls.[21]
And, as required by law, the County Defendants chose
locations that they certified were necessarily "representative"
of the monitored activity (*i.e.*, the Permittees' discharges of
stormwater runoff into the navigable waters of the United
States).[22]  Now, however, County Defendants claim that their
compliance with the Permit cannot be measured using the
results of the representative monitoring they themselves
agreed to, that the Regional Board approved, and that the
Permit itself contemplates is to be used to assess compliance
with its terms.  We take this opportunity to reevaluate and
reject County Defendants' arguments.

## CONCLUSION

Because the results of County Defendants' pollution
monitoring conclusively demonstrate that pollution levels in

---

[21] "Q: Does the County's ms4 outlet to any tributaries of the Los
Angeles River?  A: Yes.  Q: Does it outlet to tributaries of the Los
Angeles River upstream of the mass emissions station?  A: Yes. . . . Q:
Does [the County's ms4] outlet to the San Gabriel River upstream of the
mass emissions station?  A: Yes."  Pestrella Dep. 697:7–698:6, June 2,
2009.

[22] "Q: Who selected the location of those stations, do you know? A: The
County selected those locations for a particular purpose.  And the purpose
was [to be] far enough away from tidal influence *so that you would be
characterizing the stormwater runoff as opposed to ocean waters*.  Q: And
the locations were then approved by Regional Board staff; is that correct?
A: Correct."  Wamikannu Dep. 130:13–130:19, July 1, 2009 (emphasis
added).

the Los Angeles and San Gabriel Rivers are in excess of those allowed under the Permit, the County Defendants are *liable* for Permit violations as a matter of law. This case is remanded to the district court for further proceedings consistent with this opinion, including a determination of the appropriate *remedy* for the County Defendants' violations.

**REVERSED and REMANDED**.

**APPENDICES**



**Figure C-4: Los Angeles River Watershed Management Area Flow Schematic.**



**Figure C-5: San Gabriel River Watershed Management Area Flow Schematic.**