NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

JUN 18 2024

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

PANOCHE ENERGY CENTER, LLC,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL S.
REGAN, Administrator of the United States
Environmental Protection
Agency; MARTHA GUZMAN
ACEVES, Regional Administrator of
Region 9 of U.S.,

Respondents.

No. 23-1268

MEMORANDUM*

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted May 22, 2024
Anchorage, Alaska

Before: BYBEE, FRIEDLAND, and MILLER, Circuit Judges.

Panoche Energy Center petitions for review of an underground injection

control permit issued by the Environmental Protection Agency. We have

---

* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

jurisdiction under 42 U.S.C. § 300j-7(a)(2), and we deny the petition.

Under the Administrative Procedure Act, we "set aside" agency action that is "arbitrary, capricious," "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Food & Water Watch v. EPA*, 20 F.4th 506, 514 (9th Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

1. Panoche argues that the EPA violated the Safe Drinking Water Act by requiring ambient monitoring on property Panoche does not own. But the monitoring condition was within the EPA's broad statutory discretion to prevent the potential endangerment of drinking water by underground injection. The statute mandates that the EPA require monitoring "wherever appropriate, at locations and in such a manner as to provide the earliest possible detection of fluid migration" that could adversely affect human health. 42 U.S.C. § 300h-5; *see also* 42 U.S.C. § 300h(b)(1), (d)(2). It does not require the EPA to consider property ownership before determining where to require monitoring.

Panoche argues that because the Act does not expressly authorize offsite monitoring, the EPA must lack the authority to require it. However, Panoche identifies nothing in the language or structure of the statute limiting the broad grant of authority to the EPA. Nor does the offsite monitoring condition implicate federalism concerns. The permit does not interfere with state regulation of private property; it merely requires Panoche to contract for access to the necessary land. Whether the EPA may require offsite monitoring is also not a "major question": The EPA is not asserting the power to regulate "a significant portion of the American economy," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), and it is far from "implausible" that Congress contemplated offsite monitoring as a means of achieving its clear directive, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Finally, the EPA's reading of the statute does not implicate the eminent domain power or otherwise interfere with property rights. By its terms, the permit "does not convey property rights of any sort or any exclusive privilege" or "authorize . . . any invasion of other private rights." And the EPA has consistently maintained that ensuring "access to private property to meet the requirements of the permit conditions" is "outside the scope of [underground injection control] permitting authority."

2. Panoche also argues that the EPA failed to consider the cost of monitoring

on property it does not own, in contravention of the Safe Drinking Water Act, the agency's implementing regulations, and agency precedent. Assuming without deciding that some degree of cost consideration is appropriate, we conclude that the EPA's consideration of costs was adequate. The EPA determined that "monitoring is not particularly expensive when compared to the information received," and it responded to Panoche's cost concerns by reducing the number of locations and the depth at which the permit required monitoring. The EPA explained that the permit's monitoring requirement "would provide the empirical data needed about subsurface pressures, while limiting the burden and cost" of monitoring. Panoche also appears to have made no effort to determine the cost of accessing the relevant land. If, after negotiating with the neighboring landowner, Panoche is unable to secure access to the necessary land, the permit allows Panoche to request changes to the monitoring condition. *See* 40 C.F.R. § 144.39(a)(2).

3. The EPA's decision to require an ambient monitoring well near abandoned well Silver Creek #18 was not arbitrary and capricious. The EPA did not "entirely fail[] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by rejecting Panoche's concerns about its property rights. As noted above, the EPA adequately considered the costs associated with offsite monitoring. Nor did the EPA treat Panoche differently from similarly situated permittees by

requiring offsite monitoring in this case. Panoche identifies no case in which the agency declined to require offsite monitoring when the area of review contained several abandoned wells penetrating the injection zone and the permittee had not yet attempted to access the necessary property.

The EPA's decision to require ambient monitoring near Silver Creek #18 also evinced a rational connection between the facts found and the choice made. Panoche bears the burden of showing that its injection activities pose no risk of endangerment. *See* 40 C.F.R. § 144.12(a). The EPA conducted a site-specific analysis—considering, for example, the fact that the abandoned wells penetrate an over-pressurized injection zone and lack adequate long-string casing and cement plugs—to determine that the abandoned wells pose a risk of endangerment necessitating monitoring. The EPA reasonably refused to credit Panoche's argument that there is no current risk of endangerment because the mud used to plug Silver Creek #18 was legally adequate under state law in 1974.

Contrary to Panoche's representation, the EPA's decision to require ambient monitoring did not depend on an irrational assumption that Panoche would operate at maximum capacity. Instead, the agency reasoned that because the Panoche Formation is already over-pressurized, *any* additional fluids injected could result in pressure or water quality changes in the underground source of drinking water, which monitoring could help detect.

The EPA also did not irrationally fail to consider how the region's sandstone and natural confining layers could reduce fluid migration from the injection zone. The monitoring requirement was based on the EPA's concern regarding fluids migrating through abandoned wells that pierce those layers.

Finally, it was not irrational for the EPA to require ambient monitoring even though fluid migration from the injection zone might not worsen water quality. The EPA's observation that the effect of fluid migration on water quality depends on the concentration of contaminants in the fluid is consistent with its statutory and regulatory authority to require monitoring to prevent potential endangerment. *See* 42 U.S.C. §§ 300h(d)(2), 300h-5; 40 C.F.R. § 146.13(d)(1).

**PETITION DENIED.**