**GENERAL MOTORS CORPORATION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner, Administrator, U.S. Environmental Protection Agency, Respondents.**

No. 98–1027.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1998.

Decided March 23, 1999.

Michael F. McBride argued the cause for petitioner. With him on the briefs were LaJuana S. Wilcher, D. Randall Benn, Robert J. Kinney, Brenda Durham, and James P. Walle.

Christopher S. Vaden, Attorney, U.S. Department of Justice, argued the cause for respondents. On the brief were Lois J. Schiffer, Assistant Attorney General, Karen L. Egbert, Attorney, and Richard T. Witt, Steven J. Sweeney, and Reginald Pallesen, Attorneys, Environmental Protection Agency.

Scott M. DuBoff, Kenneth S. Kaufman, Saône Baron Crocker, Julie Becker, Thomas M. Sneeringer, George Vary, Charles H. Lockwood, Fred Main, Robin S. Conrad, J. Walker Henry, Jan Amundson, Marjorie E. Powell, and John W. Pettit were on the brief for amici curiae American Automobile Manufacturers Association, et al.

Joseph M. Polito, Jay E. Brant, Christopher J. Dunsky, Kenneth C. Gold, and Daniella D. Landers were on the brief for amici curiae Dott Industries, Inc., et al.

Before: WILLIAMS, GINSBURG, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Environmental Protection Agency determined that General Motors violated a Clean Water Act permit issued by the State of Michigan, for which the agency imposed an administrative penalty of $62,500. GM petitions for review, arguing primarily that the EPA erred in refusing to consider the Company's collateral attack upon the validity of the state-issued permit. We conclude, first, that the EPA reasonably interpreted the Clean Water Act, 33 U.S.C. § 1311 *et seq.*, to preclude such a collateral attack in the course of an enforcement proceeding and, second, that substantial evidence supports the EPA's finding that GM violated the permit. Accordingly, we deny the Company's petition for review.

## I. Background

Section 402 of the CWA, *id.* § 1342, establishes the National Pollutant Discharge Elimination System (NPDES), a permitting program through which the EPA and the several States implement various regulatory limits upon the discharge of pollutants into navigable waters. Forty-two States, includ-

ing Michigan, administer the NPDES program within their borders. *See* § 1342(b). Although those States assume responsibility as the primary permitting authority, *see* § 1342(c), the EPA retains the power to enforce state-issued permits in federal court. *See, e.g.,* § 1319.

In 1984 GM applied to the Michigan Department of Natural Resources for an NPDES permit to discharge stormwater from a point source, known as "Outfall 002," at a plant in Pontiac, Michigan. The MDNR initially advised GM that it would not act upon the application until later that year, when GM would be applying to renew its NPDES permit for the other point sources at the plant. Upon receiving the renewal application, however, the MDNR decided not to address the stormwater permit application for Outfall 002 but rather to revisit that matter "when EPA finalizes stormwater discharge permit regulations." In 1987 the Congress put a stop to the EPA's ongoing attempt to craft stormwater permit regulations by prohibiting, except in limited circumstances, "the Administrator or the State … [from requiring] a permit under this section for discharges composed entirely of stormwater." 33 U.S.C. § 1342(p)(1).*

In June, 1988 the MDNR issued GM a stormwater NPDES permit for Outfall 002 based upon its 1984 application. The permit advised GM that if aggrieved by its terms the Company could petition the MDNR for review but that the agency "may reject any petition filed more than 60 days after issuance as being untimely." The permit, which specified limits upon GM's discharge of copper, lead, and zinc, was to be in effect through October 1, 1990. GM could renew the permit by submitting the appropriate forms "no later than 180 days prior to the date of expiration." GM did not challenge the terms of the permit. Meanwhile, in August, 1988, the Pontiac plant ceased operating.

As required by its permit, GM began to submit to the MDNR periodic discharge monitoring reports (DMRs) for Outfall 002. Beginning in May, 1989 the DMRs revealed that water discharged at Outfall 002 contained levels of metals in excess of the limits set in the permit. GM determined that those levels were the result not of cross-connections to the plant's idled operations but of some combination of metals present in the rain and metals leached from the roofs of buildings and from copper gutters.

In 1991 the EPA twice ordered GM to come into compliance with the terms of its permit. GM responded by coating most of the roofs and gutters, which lowered the concentrations of metals in the discharges, but did not bring GM into full compliance with the terms of its permit. In 1993 the EPA filed an administrative complaint against GM under § 1319(g)(1), alleging 92 violations of its NPDES permit and seeking the maximum administrative penalty ($125,-000) permitted under § 1319(g)(2)(B).

After a hearing an Administrative Law Judge held that GM had violated the terms of its permit. First, the ALJ rejected GM's claims that when found in stormwater copper, lead, and zinc are not "pollutants" within the meaning of the CWA, *see* § 1362(6), (13), and that channeling stormwater to a point source does not constitute adding pollutants to navigable waters. Second, the ALJ held that GM's failure to challenge its NPDES permit within 60 days of its issuance by the MDNR prevented the Company from mounting a collateral attack upon the permit in the course of the EPA enforcement action; therefore he did not consider GM's claims that the permit was void both for mutual mistake and under the prohibition of stormwater permits in 33 U.S.C. § 1342(p). Third, based upon his reading of Michigan case law and upon GM's conduct after October 1, 1990—the Company continued to submit DMRs and thrice wrote to the MDNR requesting that it terminate the permit for Outfall 002—the ALJ held that the permit had not expired upon that date despite GM's failure to apply for an extension at least 180 days prior thereto. Finally, the ALJ rejected GM's skeletal equal protection and due process claims on the ground that GM's status as an NPDES stormwater permittee both

---

* This prohibition was to last until 1992, but was extended by statute to 1994 and then by regulation to 2001. *See* Pub.L. No. 102–580, § 364(1) (1992); 60 Fed.Reg. 40,230, 40,230/3 (1995).

distinguished it from other companies with similar discharges and gave it notice of the basis for the enforcement action against it.

The ALJ assessed GM a civil penalty of $62,500, half the amount sought by the EPA, because GM's violations were not willful and because but for the Company's apparently unique status as holder of an NPDES permit for discharges of stormwater it likely would have faced no penalty at all. *See* § 1319(g)(3) ("In determining the amount of any penalty assessed under this subsection, the [agency] ... shall take into account ... such other matters as justice may require"). The ALJ also held that if the Environmental Appeals Board or this court reversed his ruling that the permit continued in effect after October 1, 1990, then the 39 violations that occurred before that date would still warrant a penalty of $62,500. The EAB affirmed the judgment of the ALJ.

## II. Analysis

█ We review the EPA's finding of violations of a permit issued under the Clean Water Act for lack of "substantial evidence in the record, taken as a whole," and the assessment of an administrative penalty for "abuse of discretion," 33 U.S.C. § 1319(g)(8), as we would under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (E). *Cf. Buxton v. EPA,* 961 F.Supp. 6, 9 (D.D.C.1997). Because in this case GM does not argue that the EPA abused its discretion in assessing the penalty, we address only the question whether substantial evidence supports the agency's finding that the Company violated the terms of its permit.

GM raises a threshold challenge to the EPA's reliance upon the Clean Water Act rather than upon state law and, as a fallback position, challenges the EPA's interpretation of the Clean Water Act. We dispose of those arguments before turning to GM's other objections to the EPA's decision.

## A. Federal versus State Law

█ GM's initial argument is that the EAB erred in following federal rather than Michigan law, which arguably permits a collateral attack upon a state-issued permit when the State initiates the enforcement proceeding. *See Michigan v. Sperandeo,* 112 Mich.App. 337, 342, 315 N.W.2d 863, 865 (1981). Apparently, in GM's view the alternative to state law on the question of collateral attacks is federal common law, which would be inappropriate under the Supreme Court's teaching in *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). *See id.* at 87, 114 S.Ct. 2048 (limiting federal common law to situations in which "there is a significant conflict between some federal policy or interest and the use of state law").

The pertinent distinction between this case and *O'Melveny,* however, is that here there is a federal statute to apply. Accordingly, our task is but to "construe[ ] the language of [the] federal statute ... [an] enterprise [that] is, and always has been, a matter of federal law." *RTC v. Diamond,* 45 F.3d 665, 671 (2d Cir.1995); *see also Auction Co. of Am. v. FDIC,* 132 F.3d 746, 749 (D.C.Cir. 1997) (statute applies "by its own terms ... not by virtue of any lawmaking power of federal courts"). Therefore, there is no choice of law issue.

Nor do the cases GM cites provide any support for the proposition that state law governs which defenses a permittee may raise in the course of a federal proceeding to enforce the terms of a state-issued permit. *See United States v. Puerto Rico,* 721 F.2d 832 (1st Cir.1983) (resolving question whether CWA ousts federal courts of their original jurisdiction, under 28 U.S.C. § 1345, of all suits brought by the United States, not whether federal enforcement agency must apply state law); *District of Columbia v. Schramm,* 631 F.2d 854, 863 (D.C.Cir.1980) (holding that CWA does not create "implied right of action" for private party to challenge state permitting decision, not that state law follows state permit into federal forum for enforcement of CWA).

Accordingly, we reject GM's claim that the Environmental Appeals Board erred in looking to federal law in order to determine whether GM could raise a collateral attack upon the validity of its permit in an administrative penalty proceeding brought pursuant to § 1319(g).

## B. What Does Federal Law Allow?

■ As noted above, under § 1319(g)(8) the standard for reviewing the EPA's finding that a person has violated a permit is whether "there is ... substantial evidence in the record, taken as a whole, to support the finding of a violation." In this case GM claims there is no substantial evidence that it violated its permit because the evidence demonstrates that the permit was invalid from the outset, but the EPA refused to hear this attack upon the validity of the permit. The question now before us, therefore, is whether the EPA erred in interpreting the CWA to limit the grounds upon which GM may challenge the validity and applicability of its permit in this federal enforcement proceeding. *Cf. Hoffman Homes, Inc. v. EPA,* 999 F.2d 256, 260–61 (7th Cir.1993) (reviewing EPA's interpretation of CWA regulations in course of administrative penalty proceeding).

■ As GM suggests, because the EPA is charged with administering § 1319(g)(1), we review its decision per the familiar analysis of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Our first task, using the "traditional tools of statutory construction" is to determine whether the Congress has spoken to "the precise question at issue," *id.* at 843 n. 9, 104 S.Ct. 2778. If so, then we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If the Congress has not expressed itself on that question, then *Chevron* step two requires the court to defer to the agency's interpretation if it "is reasonable and consistent with the statutory purpose." *Ohio v. United States Dep't of Interior,* 880 F.2d 432, 441 (D.C.Cir. 1989).

### 1. *Chevron* step one

In its brief, GM raised two arguments against the EPA's interpretation. First, GM claimed that the EPA required it to exhaust its state administrative remedies, despite the lack of an exhaustion requirement in the CWA and in the teeth of the Supreme Court's teaching that such a requirement can be imposed only by positive law—that is, by statute or agency rule. *See Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125

L.Ed.2d 113 (1993); *see also Time Warner Entertainment Co. v. FCC,* 144 F.3d 75, 79 n. 5 (D.C.Cir.1998) ("[J]udge made notions of 'common law' [exhaustion] always yield to statutes—particularly in administrative law"). An exhaustion requirement, however, is not the same as a prohibition upon collateral attack. The former refers to administrative or judicial proceedings that must be completed as a prelude to federal judicial review; in the reviewing forum, of course, such proceedings do not have *res judicata* effect. For example, on a petition to review a decision of the NLRB, a federal court will not hear an issue that was not first raised before the agency; an issue that was raised before the agency, however, is not *res judicata* but open to review. *See, e.g., Exxel/Atmos, Inc. v. NLRB,* 147 F.3d 972, 978 (D.C.Cir.1998); *see also* 28 U.S.C. § 2254(b)(1)(A) (federal court shall not grant a state prisoner's petition for writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State"). In contrast, the state administrative and judicial proceedings that GM failed to pursue when the MDNR issued its permit would not have been but a prelude to further review by the EPA. On the contrary, had GM pursued its state remedies and prevailed, then there would have been no permit for the EPA to enforce; had GM done so and lost, then it would have been prevented, under the doctrine of *res judicata,* from relitigating the validity of its permit in a later enforcement proceeding before the EPA.

At oral argument, GM in fact acknowledged that the EAB had merely been imprecise, using the language of exhaustion and of prohibition interchangeably; the Board did not purport to require that the Company have exhausted its state remedies in order to challenge the validity of its permit in the EPA enforcement proceeding. That is, the EAB did not even imply that it could have heard GM's challenge to the validity of its permit if only GM had previously sought state administrative and judicial review of that permit (and presumably been denied relief in those fora). Because the EAB did not interpret the CWA to require exhaustion of state remedies prior to raising a collateral

attack upon the validity of a permit in a federal enforcement proceeding, GM's first argument fails. (For the same reason, the argument made by a number of Michigan companies appearing as amici—that even if the EAB correctly imposed an exhaustion requirement, GM nonetheless should be permitted collaterally to attack its permit under the authority of *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)—is irrelevant.)

Second, GM (joined by the Michigan amici) argues that the CWA allows a collateral attack upon a state-issued NPDES permit in an enforcement proceeding because § 1369(b)(2) prohibits only collateral attacks against "[a]ction[s] of the Administrator with respect to which review could have been obtained under [§ 1369(b)(1) ]," of which one is "issuing or denying any [NPDES] permit." A state-issued NPDES permit, GM points out, is neither an action of the Administrator nor otherwise made reviewable under § 1369(b)(1); therefore, the argument goes, the prohibition of collateral attacks in § 1369(b)(2) does not bar its challenge in this federal proceeding to the validity of its state-issued permit. Further, because references to state-issued and EPA-issued permits are so often coupled in the Clean Water Act, *see, e.g.,* 33 U.S.C. §§ 1311(i) & (k), 1319(c)-(d) & (g), 1342(p), GM would have us infer that, by referring in § 1369(b)(2) solely to "[a]ction[s] of the Administrator," the Congress intended not to bar a collateral attack against a state-issued permit; *expressio unius est exclusio alterius.*

The inference GM would have us draw, however, simply does not follow. Section 1369(b)(1) authorizes the federal courts of appeals to review certain actions of the EPA, not to review the permitting decisions of the States. The failure of the Congress in § 1369(b)(2) expressly to forbid collateral attacks upon state permits is of no import, therefore. That is, not having authorized any review of state permits in the first place, the Congress simply had no reason to single out and prohibit collateral review of state permits.

In sum, neither of GM's arguments persuades us that the Congress resolved the question whether a state permittee may collaterally challenge the validity of its state-issued permit in the course of a federal enforcement proceeding. We must therefore proceed to *Chevron* step two and determine whether the EPA reasonably interpreted the CWA to preclude such a collateral attack.

### 2. *Chevron* step two

Presumably, the EPA would not find a permit violation if a permit holder could demonstrate that a state court had previously decided that the permit was void *ab initio*; certainly we would not find reasonable an interpretation of the CWA that precluded such a challenge to an EPA enforcement action. GM can point to no such decision, however, because it declined to take advantage of available state procedures to challenge its permit. *Cf. PIRG v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 78 & n. 27 (3d Cir.1990) (permittee "not denied due process" when denied opportunity collaterally to attack permit because "it simply failed to use the process available to it"). And the EPA persuasively argues that it reasonably interpreted the Act to prevent GM from doing in a federal enforcement proceeding what the Company had declined to do before the MDNR and the Michigan state courts.

First, the Clean Water Act assigns to the participating states the primary role in administering the NPDES permitting program. *See American Paper Inst., Inc. v. EPA,* 890 F.2d 869, 874 (7th Cir.1989) (stating it "seems beyond argument that we should construe the [Clean Water] Act to place maximum responsibility for permitting decisions on the states"). As the EPA states, precluding collateral attacks ensures that "the States [have] the opportunity as a threshold matter to address objections" to the permits they issue. Moreover, when a permit has been issued by a state agency, it alone will have the information pertinent to an attack upon the decisionmaking process that led to the issuance of that permit. Not only would the EPA have to expend considerable resources to obtain the information from the state agency; it would also be second-guessing that agency, which is inconsistent with the primary role of the States under the Act.

Relatedly, the EPA argues that precluding collateral attacks is "consistent with Congress' desire to limit the scope of enforcement proceedings," as evidenced by a committee report on the 1972 Clean Water Act amendments: "Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decisionmaking or delay." S.Rep. No. 92–414, at 64 (1971), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3730. While we might not consider such a report indicative of the intent of the whole Congress, we do think it bolsters the agency's claim to have made a reasonable interpretation of the Act. If the EPA cannot preclude a collateral attack upon a state-issued permit, then it will find enforcement proceedings burdened by all manner of objections to the state proceedings leading up to issuance of the permit. Enforcement will become a protracted rather than an expedited undertaking.

Finally, this court, in a dictum in *Schramm*, noted that "congressional silence on federal court review of state permits is consistent with the view that challengers to those permits should be relegated to state law remedies in state courts." 631 F.2d at 863 n. 15. Certainly the EPA, acting in accordance with this dictum, the division of authority in the Act between state and federal permitting agencies, and the Senate Committee's expectation that enforcement proceedings would be straightforward and speedy, could reasonably interpret the Act to remit to a state forum any attack upon the validity of a state permit. Therefore, applying *Chevron* step two, we conclude that the EPA was not unreasonable in interpreting the CWA to preclude GM from attacking the validity of its state permit in this federal enforcement proceeding.

## C. GM's Other Challenges

GM raises two arguments that are not foreclosed by the conclusion reached immediately above. Each may be resolved in short order.

First, GM contends the EPA erred in concluding that the permit for Outfall 002 did not expire on October 1, 1990. Recall the ALJ held that the appropriate penalty would be the same regardless of whether GM was responsible for the discharges after that date, and GM did not challenge the ALJ's penalty calculations before the EAB or this court. Therefore, we need not resolve whether substantial evidence supports the EPA's finding that GM violated the terms of its permit after October 1, 1990; even if GM did not do so, its penalty would still be $62,500.

Second, GM claims it was denied due process because it lacked notice that "metals present in rainfall or leached from roofs and gutters would be considered 'pollutants' that were the responsibility of the permit holder." The permit for Outfall 002, however, clearly states that "the permittee is authorized to discharge an unspecified amount of stormwater runoff .... [which] shall be limited [to 140 μg/l of copper, 75μg/of lead, and 1000 Sg/l of zinc]." GM, in its correspondence informing the MDNR of its permit violations, itself counted the ambient and leached metals as contributing to those violations. Consequently, GM's lack of notice claim rings hollow, to say the least. *See NRDC v. EPA*, 673 F.2d 400, 406–07 (D.C.Cir.1982) ("Each individual subject to the [Consolidated Permit Regulations] will of necessity have participated in a permit proceeding before being punished for violating the conditions specified in his permit. A polluter charged with violating those conditions will certainly be on notice of the duty he is alleged to have breached").

This exhausts GM's challenges to the EPA's finding that the Company violated its NPDES permit for Outfall 002. GM does not contest the EPA's conclusion that the information contained in the DMRs it submitted constitutes substantial evidence that GM violated its permit on at least 39 occasions prior to October 1, 1990. Accordingly, we hold that substantial evidence supports the EPA's finding of violations.

## III. Conclusion

For the foregoing reasons, the petition for review is

*Denied.*