FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE, | No.21-35881 |
| *Plaintiff-Appellant*, | D.C. No. 3:17-cv-05016-BHS |
| v. | |
| PORT OF TACOMA; SSA TERMINALS LLC; SSA TERMINALS (TACOMA), LLC, | OPINION |
| *Defendants-Appellees*, | |
| and | |
| APM TERMINALS TACOMA LLC; DON ESTERBROOK, | |
| *Defendants*. | |

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE, | No.21-35899 |
| Plaintiff-Appellee, | D.C. No. 3:17-cv-05016-BHS |
| v. | |

PORT OF TACOMA,

  *Defendant-Appellant*,

 and

SSA TERMINALS LLC; SSA
TERMINALS (TACOMA), LLC;
APM TERMINALS TACOMA LLC;
DON ESTERBROOK,

  *Defendants*.

PUGET SOUNDKEEPER
ALLIANCE,

  *Plaintiff-Appellee*,

  v.

SSA TERMINALS LLC; SSA
TERMINALS (TACOMA), LLC,

  *Defendants-Appellants*,

 and

PORT OF TACOMA; APM
TERMINALS TACOMA LLC; DON
ESTERBROOK,

  *Defendants*.

No.22-35061

D.C. No.
3:17-cv-05016-
BHS

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted December 7, 2022
Submission Withdrawn August 18, 2023
Resubmitted June 10, 2024
Seattle, Washington

Filed June 10, 2024

Before:  Diarmuid F. O'Scannlain, M. Margaret McKeown,
and Eric D. Miller, Circuit Judges.

Opinion by Judge Miller;
Special Concurrence by Judge O'Scannlain

---

## SUMMARY[*]

---

### Environmental Law

The panel reversed in part and vacated in part the district court's partial summary judgment in favor of the Port of Tacoma and SSA Terminals, LLC, and affiliated companies, in a citizen suit brought under the Clean Water Act by Puget Soundkeeper Alliance.

The Port and SSA operate the West Sitcum Terminal, a marine cargo terminal. "The Wharf" is a portion of the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Terminal where five large cranes load and unload container ships. When rain falls on the Terminal, stormwater runs into Puget Sound, carrying with it metals and other pollutants. In 2010, 2015, and 2020, the Washington State Department of Ecology issued editions of the Industrial Stormwater General Permit (ISGP), a National Pollutant Discharge Elimination System (NPDES) permit, pursuant to its authority under the Clean Water Act.

The Clean Water Act prohibits "the discharge of any pollutant by any person" into the waters of the United States without an NPDES permit, but only certain categories of stormwater discharges require a permit. One such category is stormwater discharges "associated with industrial activity." The Environmental Protection Agency's regulations define that category to include discharges from transportation facilities, further defined as facilities that house vehicle maintenance shops, equipment cleaning operations, or airport deicing operations. Because such activities do not occur at the Wharf, discharges from there do not require NPDES permits. The district court concluded that the ISGPs did not extend coverage to the Wharf.

Reversing in part, the panel held that the plain text of the 2010 and 2015 ISGPs required that a transportation facility conducting industrial activities implement stormwater controls across the entire facility. Because the Terminal was a facility conducting industrial activities, the permits, and the obligations under them, applied to the entire facility, including the Wharf. The Port therefore needed to implement appropriate stormwater controls across the footprint of the Terminal while the 2010 and 2015 ISGPs were in effect.

The panel further held that, even though the ISGPs exceeded the requirements of the federal regulations, they were enforceable in a citizen suit. Agreeing with other Circuits, the panel held that the Port could not collaterally attack the validity of the conditions in the 2010 and 2015 ISGPs.

Soon after the 2020 ISGP was issued, several parties, including Soundkeeper and the Port, appealed it to the Washington State Pollution Control Hearings Board. The Board issued a decision in which it agreed with the Port that the 2020 ISGP did not cover the entire Terminal. The Washington Court of Appeals reversed. The Port petitioned for review in the Washington Supreme Court, and the petition remains pending. The panel vacated the district court's decision insofar as it resolved the scope of the 2020 ISGP and remanded for further consideration. The panel stated that, on remand, the district court could, in its discretion, evaluate how best to address the risk of piecemeal litigation and conflicting judgments.

Specially concurring, Judge O'Scannlain wrote that *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995), Ninth Circuit precedent on which the opinion correctly relied, expanded citizen standing in a way Congress never intended. He wrote that if that case did not apply, then private citizens such as Soundkeeper would have no standing to sue as to the portion of the case dealing with stormwater discharges from the Wharf.

The panel addressed additional issues in a concurrently-filed memorandum disposition.

**COUNSEL**

Claire E. Tonry (argued), Alyssa L. Koepfgen, and Richard A. Smith, Smith & Lowney PLLC, Seattle, Washington, for Plaintiff-Appellant/Cross-Appellee.

Bradford Doll (argued), Lynne M. Cohee, James A. Tupper, Jr., and Haylee Ventoza, Tupper Mack Wells PLLC, Seattle, Washington, for Defendants-Appellees/Cross-Appellants

Bradley B. Jones (argued), Dianne K. Conway, Gordon Thomas Honeywell LLP, Tacoma, Washington, for Defendants-Appellees/Cross-Appellants.

Frank J. Chmelik, Peter M. Ruffatto, Holly M. Stafford, and Sara B. Frase, Chmelik Sitkin & Davis P.S., Bellingham, Washington, for Amici Curiae Washington Public Ports Association and Pacific Merchant Shipping Association.

**OPINION**

MILLER, Circuit Judge:

Discharges of stormwater are not generally regulated under the Clean Water Act, but they are regulated when they result from certain industrial activities. This case involves a facility that conducts such activities. The question presented is whether regulation extends to all discharges from the facility or only to discharges from the portions of the facility where the industrial activities occur. We consider that question in the context of several different versions of Washington State's Industrial Stormwater General Permit, which implements the Clean Water Act in Washington. With respect to those permits that have not been challenged in

state court, we conclude that the plain text of the permits extends coverage to the entire facility and that the validity of the permits is not subject to collateral attack in federal court. We therefore reverse the district court's contrary determination. With respect to the permit that is subject to an ongoing state-court challenge, we remand to allow the district court to consider in the first instance the effect of the state proceedings on this case.

## I

The Clean Water Act prohibits "the discharge of any pollutant by any person" into the waters of the United States without a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1311(a); *see NRDC v. County of Los Angeles*, 725 F.3d 1194, 1198 (9th Cir. 2013). The Environmental Protection Agency has authority to issue regulations implementing the Act, 33 U.S.C. § 1361(a), and to issue NPDES permits, *id.* § 1342(a).

The West Sitcum Terminal is a 137-acre marine cargo terminal located on Commencement Bay, an arm of Puget Sound, in Tacoma, Washington. It is operated by the Port of Tacoma and by SSA Terminals, LLC and affiliated companies (collectively, the Port). At issue in this case is a 12.6-acre portion of the Terminal, commonly referred to as "the Wharf," where five large cranes load and unload container ships.

When rain falls on the Terminal, stormwater runs into Puget Sound, carrying with it metals and other pollutants. But in recognition that "[p]ractically speaking, rain water will run downhill, and not even a law passed by the Congress of the United States can stop that," the Clean Water Act does not require an NPDES permit for all discharges of stormwater. *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530

(11th Cir. 1996); *see* 33 U.S.C. § 1342(p) (defining the scope of stormwater regulation). Instead, only certain categories of stormwater discharges require a permit.

One such category is stormwater discharges "associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B). EPA's regulations define that category to include discharges from "[t]ransportation facilities" (further defined as facilities that fall within specified Standard Industrial Classifications) that house "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations." 40 C.F.R. § 122.26(b)(14)(viii). The Terminal is such a facility, but the regulations do not require it to control every discharge of stormwater. Rather, they apply to "*[o]nly those portions* of the facility that are . . . involved in vehicle maintenance . . . , equipment cleaning operations, [or] airport deicing operations." *Id.* (emphasis added). Because such activities do not occur at the Wharf, discharges from there do not require NPDES permits.

Although the EPA has the authority to issue NPDES permits itself, 33 U.S.C. § 1342(a), it can delegate that responsibility to the States, *id.* § 1342(b); *see Southern Cal. All. of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 834 (9th Cir. 2021). It has done so in almost every State, including Washington. 39 Fed. Reg. 26,061 (1974). Exercising its delegated authority, Washington regulates industrial stormwater discharges through a "general permit," a single NPDES permit that applies to all facilities conducting industrial activities that discharge stormwater to a surface water body or a storm sewer that drains to one. *See Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014). That permit, the Industrial Stormwater General Permit (ISGP), is issued by the Washington State Department of Ecology (Ecology),

which is responsible for Clean Water Act permitting on behalf of the State. At issue here are the three editions of the ISGP issued in 2010, 2015, and 2020, each with a term of five years.

The ISGPs purport to define the requirements of the Clean Water Act: They state that "[a]ny permit noncompliance constitutes a violation of the Clean Water Act." (Many of the words in the ISGPs are italicized; we omit the italics throughout.) But beginning in 2010, Ecology omitted the limiting terms of the federal regulations—that is, the terms confining regulation of industrial stormwater to "[o]nly those portions of a facility" where vehicle maintenance, equipment cleaning, and airport deicing take place—from the ISGPs governing discharges from the Port. 40 C.F.R. § 122.26(b)(14)(viii). Instead, the 2010 permit states that it applies to "[t]ransportation facilities"—not merely portions of such facilities—"which have vehicle maintenance shops, material handling facilities, equipment cleaning operations, or airport deicing operations." The relevant provisions of the 2015 and 2020 permits are the same.

Puget Soundkeeper Alliance (Soundkeeper) is an environmental organization concerned with water quality in Puget Sound. It brought this action under the citizen-suit provision of the Clean Water Act, 33 U.S.C. § 1365, alleging that the Port had violated the Act in various respects. In a memorandum disposition filed concurrently with this opinion, we address Soundkeeper's claims about the discharges from the Terminal that uncontroversially require some degree of regulation. In this opinion, we confine ourselves to considering whether stormwater discharges from the Wharf are subject to regulation.

The district court granted partial summary judgment to the Port on that issue. The court held that the ISGPs do not extend coverage to the entire footprint of facilities that conduct industrial activity. Although the "Permit Coverage" sections of the ISGPs omit the limiting terms from the federal regulations, the court looked to Table 1, which appears just under the "Permit Coverage" section of the ISGPs, and which sets out a list of "activities requiring permit coverage." In the 2010 ISGP, the definition section says that "Table 1 lists the 11 categories of industrial activities identified in 40 CFR 122.26(b)(14)(i-xi) in a different format." Accordingly, the court reasoned, the inclusion of Table 1 in the ISGPs was tantamount to the incorporation of the federal regulations, including section 122.26(b)(14)(viii), which limits the definition of industrial activity—and thus the scope of regulatory coverage—to include only the portions of facilities where that activity takes place. Having determined that the ISGPs do not extend coverage to the Wharf, the court did not consider the Port's alternative argument that, to the extent the ISGPs do extend coverage to the Wharf, they may not be enforced in a citizen suit under the Clean Water Act.

The district court subsequently resolved the remaining claims and entered a final judgment, which both sides appealed under 28 U.S.C. § 1291.

II

The district court analyzed all three ISGPs—the 2010, 2015, and 2020 editions—together, but as the case comes before us, the 2020 ISGP presents distinct issues from the earlier permits. We begin by considering the 2010 and 2015 ISGPs before turning to the 2020 ISGP.

The district court believed that the ISGPs do not extend coverage to the Wharf. The Port defends that interpretation and, alternatively, renews its argument that if the ISGPs do extend coverage to the Wharf, they may not be enforced in a citizen suit under the Clean Water Act. We reject both arguments.

A

At the outset, we must determine the standard of review that applies to the ISGPs. The district court reasoned that "NPDES permits are treated like any other contract." *County of Los Angeles*, 725 F.3d at 1204. But that is true only of an individual permit—that is, a permit authorizing a particular entity to discharge a pollutant in a specific place. *See Alaska Cmty. Action on Toxics*, 765 F.3d at 1172. An ISGP is a general permit—that is, a permit that authorizes discharges by an entire class of potential dischargers across a region. *Id.* Because such a permit is more akin to a regulation, we interpret it as we would a regulation. *Id.* In either case, however, we must "give effect to the natural and plain meaning of [the permit's] words." *Id.* (quoting *Bayview Hunters Point Cmty. Advocates v. Metropolitan Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004)); *accord County of Los Angeles*, 725 F.3d at 1204–05 ("If the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.'" (quoting *Piney Run Pres. Ass'n v. County Comm'rs of Carroll Cnty.*, 268 F.3d 255, 270 (4th Cir. 2001))). We review the district court's interpretation de novo. *Alaska Cmty. Action on Toxics*, 765 F.3d at 1172.

The 2010 and 2015 ISGPs plainly require that a transportation facility conducting industrial activities

implement stormwater controls across the entire facility. The first section of the ISGPs, entitled "S1. Permit Coverage," begins by stating that "[t]his statewide permit applies to facilities conducting industrial activities that discharge stormwater." A facility "shall apply for coverage" if it "conduct[s] industrial activities listed in Table 1." Table 1 then lists industrial activities and includes an entry for "[t]ransportation facilities which have vehicle maintenance shops, material handling facilities, equipment cleaning operations, or airport deicing operations." In this respect, the ISGPs differ from the federal regulations. Under the ISGPs, coverage is triggered—that is, "[t]his statewide permit applies"—when the facility conducts industrial activity, not when a particular discharge is "associated with industrial activity." 40 C.F.R. § 122.26(a)(1)(ii). The nature of the facility, not the nature of the discharge, determines whether there is coverage. *See Puget Soundkeeper Alliance v. Pollution Control Hearings Bd.*, 545 P.3d 333, 345 (Wash. App. 2024) (holding that "it is plain that [the 2020 ISGP] requires coverage for the land and appurtenances at any transportation facility that conducts vehicle maintenance, equipment cleaning, or airport deicing operations—that is, the entire footprint of the transportation facility"). Because the Terminal is a facility conducting industrial activities, the permits apply to the entire facility, including the Wharf.

The Port argues that regardless of whether the permits writ large apply to the entire facility, the specific provisions of the permits—prescribing the actual substance of the permit-holders' obligations—are written so as to control only discharges associated with industrial activity. To the contrary, the permits' specific obligations encompass the entire facility.

The ISGPs impose a range of obligations on permit-holders, all of which are derivative, in one way or another, of two core obligations: the preparation of a Stormwater Pollution Prevention Plan and regular sampling of discharges for pollutants. Those two obligations apply across the entire facility. In preparing a Stormwater Pollution Prevention Plan, the permit-holder must identify and implement "all known, available, and reasonable methods of prevention, control and treatment . . . of stormwater pollution." The permit offers no qualification or limitation based on where, on site, the stormwater pollution originates. A permit-holder must update the plan if it determines that the current plan would be "ineffective in eliminating . . . pollutants in stormwater discharges from the *site*." (emphasis added). The plan evidently concerns reduction of pollution from the site as a whole, not pollution associated with specific industrial activities. Likewise, the permit-holder must sample discharges from the entire site. Specifically, Condition S4 requires sampling of pollutant levels at "each distinct point of discharge off-site," not just at discharge points associated with industrial activity.

Because the obligations to prepare a Stormwater Pollution Prevention Plan and to sample encompass discharges from the entire facility, so, too, do the rest of the permit's obligations, such as the obligations to inspect discharges from the facility, to monitor discharges for exceedances of benchmark levels, to take corrective actions when pollutant levels in discharges exceed applicable benchmarks, and to comply with water quality standards. Consistent with the opening sentence of the permits, the permits "appl[y]" to the entire Terminal.

Where the ISGPs limit the scope of their coverage, they say so clearly by exempting discharges or applying specific

rules to them. For instance, "if any part of a facility . . . has a stormwater discharge" containing certain toxic pollutants, the permit-holder must secure an "individual NPDES" permit for that discharge. Similarly, the permits explain that "[f]or sites that discharge to both surface water and ground water, the terms and conditions of this permit shall apply to all ground water discharges," but permittees "are not required to sample on-site discharges to ground." Those carve-outs underscore that, in the ordinary course, the permits require compliance across discharges at an entire facility.

In reaching a contrary conclusion, the district court focused on the permits' definition of industrial activity. In the 2010 ISGP, the definition of "industrial activity" includes the following sentence: "Table 1 lists the 11 categories of industrial activities identified in 40 CFR 122.26(b)(14)(i-xi) in a different format." According to the district court, the ISGP therefore incorporates the federal regulatory definition of what industrial activities are covered at a transportation facility.

The 2015 ISGP does not include that sentence in its definition of "industrial activity," so that line of argument is of limited value in interpreting the 2015 ISGP. Regardless, we read both editions of the permit as requiring stormwater controls across the entirety of facilities conducting industrial activity. The permit "applies to facilities conducting industrial activities," not to discharges associated with industrial activity. Even if the ISGPs mirrored 40 C.F.R. § 122.26(b)(14)(viii) by directly stipulating that "[o]nly those portions of the facility" involved in vehicle maintenance or equipment cleaning "are associated with industrial activity," the permits' coverage would continue to depend on whether the facility as a whole "conduct[s]

industrial activities," not on whether specific discharges are associated with that activity. *See Puget Soundkeeper Alliance*, 545 P.3d at 345 (concluding that a contrary interpretation would require "read[ing] language into the definition and" making parts of the permit "superfluous").

Because the 2010 and 2015 ISGPs apply to the entirety of transportation facilities that conduct listed industrial activity, and because the Terminal is such a facility, the Port needed to implement appropriate stormwater controls across the footprint of the Terminal while the 2010 and 2015 ISGPs were in effect.

B

The Port argues that even if the ISGPs do regulate discharges from the Wharf, they are not enforceable in a citizen suit because they exceed the requirements of the federal regulations, and "Ecology never sought EPA approval to expand the scope of the NPDES program." The district court did not reach that argument, but it was preserved below. Because we may affirm on any ground supported by the record, we proceed to consider it. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1268 (9th Cir. 2022).

The Port's argument is foreclosed by the plain language of the Clean Water Act's citizen-suit provision, which states that "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a). The term "effluent standard or limitation under this chapter" is defined to include "a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter." *Id.* § 1365(f)(7); *see also id.* § 1342 (providing the general authorization for NPDES permitting).

Here, there is no dispute that the ISGP is "a permit issued under section 1342," nor that it was "in effect." It follows that Soundkeeper may bring a citizen suit to challenge an alleged violation of the ISGP. And that is how we have previously read the statute: "The plain language of [section 1365] authorizes citizens to enforce *all* permit conditions." *Northwest Env't Advocs. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995); *accord County of Los Angeles*, 725 F.3d at 1204; *Community. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002); *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004).

In urging a contrary result, the Port primarily argues that cases about the enforceability of permit conditions are inapposite because they involved "a condition plainly expressed in a permit." That is merely a reprise of the Port's argument that ISGP's plain language does not extend coverage to the Wharf, an argument that we have already rejected. The Port also invokes *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.*, in which the Second Circuit concluded that "state regulations, including the provisions of [state-issued] permits, which mandate 'a greater scope of coverage than that required' by the federal [Act] and its implementing regulations are not enforceable through a citizen suit." 12 F.3d 353, 359 (2d Cir. 1993) (quoting 40 C.F.R. § 123.1(i)(2)), *as amended* (Feb. 3, 1994). Whether or not the ISGPs prescribe "a greater scope of coverage" than the federal regulations in the sense contemplated by the Second Circuit, we note that "the holding in [*Northwest Environmental Advocates*] directly conflicts with the Second Circuit's decision in *Atlantic States*," and we are bound to follow the former. *Northwest Env't Advocs. v. City of Portland*, 74 F.3d 945, 948 (9th Cir.

1996) (O'Scannlain, J., dissenting from denial of rehearing en banc).

The Port further argues that a State cannot issue NPDES permits that exceed the stringency of federal stormwater regulations unless the State formally "determines that the [stormwater] discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 40 C.F.R. § 122.26(a)(9)(i)(D). Assuming, without deciding, that Ecology was required to make such a determination but failed to do so, we hold that the Port cannot now collaterally attack the validity of conditions in the 2010 and 2015 ISGPs.

The Clean Water Act "does not contemplate federal court review of state-issued permits." *Southern Cal. All. of Publicly Owned Treatment Works v. EPA*, 853 F.3d 1076, 1086 (9th Cir. 2017) (quoting *American Paper Inst., Inc v. EPA*, 890 F.2d 869, 875 (7th Cir. 1989)). "[S]tate officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1164 (9th Cir. 2010) (quoting *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007)).

We have previously observed that the Clean Water Act "make[s] the states, where possible, the primary regulators of the NPDES system." *Southern Cal. All. of Publicly Owned Treatment Works*, 853 F.3d at 1086 (quoting *American Paper Inst.*, 890 F.2d at 873). A party may object to the conditions of a state-issued permit on the basis of federal law, but "state courts can interpret federal law, and thus can review and enjoin state authorities from issuing

permits that violate the requirements of the Clean Water Act." *Southern Cal. All. of Publicly Owned Treatment Works*, 8 F.4th at 839 (quoting *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1434 (9th Cir. 1991)). Indeed, parties seeking review of state decisions about permits are guaranteed judicial review in state courts "that is the same as that available to obtain judicial review in federal court of a federally-issued NPDES permit." 40 C.F.R. § 123.30.

The principle that federal courts do not reconsider the validity of state-issued permits helps explain the settled rule that "[w]here a permittee discharges pollutants in compliance with the terms of its NPDES permit, the permit acts to 'shield' the permittee from liability under the CWA." *County of Los Angeles*, 725 F.3d at 1204; *see also EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976); *Alaska Cmty. Action on Toxics*, 765 F.3d at 1171. That is, if a permit-holder complies with the terms of its permit, it need not fear liability under the Clean Water Act. Neither the EPA nor a citizen can use an enforcement action or a citizen suit to revisit the validity of permit conditions. 33 U.S.C. § 1342(k). As the Supreme Court has explained, "[t]he purpose of [section 1342(k)] seems to be to . . . relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, [section 1342(k)] serves the purpose of giving permits finality." *E. I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 n.28 (1977).

Accordingly, Soundkeeper could not hold the Port liable in a citizen suit on the theory that certain permit conditions in the ISGP were invalid because they were overly permissive. By the same token, however, the Port cannot avoid liability by arguing that certain terms in its permit are invalid because they are overly restrictive. We will not

consider collateral attacks on the validity of permit conditions in the course of an enforcement action or citizen suit, whether those attacks arise offensively or defensively. *See Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1488 (9th Cir. 1987) ("The state's method of adopting a more stringent standard should be subject to scrutiny only at the permit issuance stage."), *vacated*, 485 U.S. 931 (1988), *reinstated as amended*, 853 F.2d 667 (9th Cir. 1988).

Our approach is consistent with that of other courts that have rejected collateral attacks in Clean Water Act enforcement actions. In *General Motors Corp. v. EPA*, a permit-holder sought to defend against an EPA enforcement action by arguing that certain terms in a state-issued permit exceeded the scope of lawful stormwater regulation under the Clean Water Act. 168 F.3d 1377, 1379 (D.C. Cir. 1999). The District of Columbia Circuit held that the EPA had reasonably interpreted the Act to bar a permit-holder from collaterally attacking "the validity of its state permit in [a] federal enforcement proceeding." *Id.* at 1383. Instead, the court explained, the Act "remit[s] to a state forum any attack upon the validity of a state permit." *Id.*; *accord Public Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 77–78 (3d Cir. 1990).

Likewise, the Port cannot mount a collateral attack on the validity of stormwater regulations in the 2010 and 2015 ISGPs. Ecology issued ISGPs in 2010 and 2015 providing that "[a]ny permit noncompliance constitutes a violation of the Clean Water Act." The Port now argues that the ISGPs in fact did not comply with the Act. The Port could have challenged the permits before the Washington State Pollution Control Hearings Board. *See* Wash. Rev. Code. § 43.21B.110(1)(c). Had the Board issued an unfavorable decision, the Port could have sought review in state court.

*See id.* § 43.21B.180. As we will see, the Port availed itself of just that process when it came to the 2020 ISGP.

But the Port brought no such challenge to the stormwater regulations in the 2010 and 2015 ISGPs. And because it did not, it lost "forever the right to do so." *Public Int. Rsch. Grp. of N.J., Inc.*, 913 F.2d at 78 (quoting *Texas Mun. Power Agency v. Administrator of U.S. EPA*, 836 F.2d 1482, 1484 (5th Cir. 1988)). The conditions in the 2010 and 2015 ISGPs are valid and enforceable, and the Port may be liable for discharges in violation of their terms.

## III

Finally, we turn to the 2020 ISGP. Soon after that permit was issued, several parties, including Soundkeeper and the Port, appealed it to the Washington State Pollution Control Hearings Board. *See Puget Soundkeeper All. v. Department of Ecology*, PCHB No. 19-089c, 2021 WL 1163243 (Mar. 23, 2021). In March 2021, several months after the district court's partial summary judgment order, the Board issued a decision in which it agreed with the Port that "Ecology's deletion of the '[o]nly those portions of the facility' phrase from the federal regulation does not change the fact that only specified actions are listed in the permit coverage section" and that "Ecology's claim that the 2020 ISGP covers the entire transportation facility is without support from the plain language of the permit." *Id.* at *9.

We asked the parties to file supplemental briefs addressing the preclusive effect, if any, of the Board's decision. The Port argued that because the decision "addressed the same legal issue before this Court, it should be given preclusive effect" as a matter of issue preclusion. For its part, Soundkeeper argued that the Port had forfeited any argument for issue preclusion and that, in any event,

because the Board's decision was issued after this court assumed jurisdiction over the appeal, any preclusive effect is barred by the priority-of-action rule, under which "the court which first gains jurisdiction of a cause retains the exclusive authority to deal with the action until the controversy is resolved." *Sherwin v. Arveson*, 633 P.2d 1335, 1337 (Wash. 1981).

The Board's decision was not Washington's last word on the interpretation of the 2020 ISGP. After the parties filed their supplemental briefs in this court, the Washington Court of Appeals reversed the Board's decision. *Puget Soundkeeper Alliance*, 545 P.3d at 333. Paralleling the reasoning we have employed in construing the 2010 and 2015 permits, it held that "if a transportation facility requires coverage under the 2020 permit because it conducts vehicle maintenance, equipment cleaning, or airport deicing operations, coverage under the permit applies to the entire transportation facility, not just limited areas." *Id.* at 346. The Port has petitioned for review of that decision in the Washington Supreme Court, and the petition remains pending.

The district court has not had an opportunity to consider the effect of the decision of the Washington Court of Appeals, the pending petition before the Washington Supreme Court, or the outcome of any potential remand to the Board. Rather than address those issues in the first instance, we vacate the district court's decision insofar as it resolved the scope of the 2020 ISGP, and we remand for further consideration. On remand, the district court may, in its discretion, evaluate how best to address the risk of piecemeal litigation and conflicting judgments, and it may consider any arguments that it determines to be properly

presented to it, including arguments based on issue preclusion or the priority-of-action rule.

**VACATED in part, REVERSED in part, and REMANDED.**

---

O'SCANNLAIN, Circuit Judge, specially concurring:

While I concur in the Opinion of the Court because it faithfully follows Ninth Circuit precedent, I write separately to address my concern, ever since 1996, that such precedent is flawed, not only because it created a circuit split at the time, but because it continues to expand citizen standing in a way Congress never intended.

The precedent on which the Opinion correctly relies is *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) ("*NWEA II*"). If *NWEA II* did not apply, private citizens such as Puget Soundkeeper Alliance would have no standing to sue as to that portion of the case dealing with stormwater discharges from the Wharf.

At the time that *NWEA II* was published, I and several other colleagues objected to its holding, noting that "any citizen will now be permitted to bring a lawsuit at government expense for the enforcement of state water quality standards that have not been translated into effluent limitations in federal permits." *Nw. Envtl. Advocates v. City of Portland*, 74 F.3d 945, 946 (9th Cir. 1996) (O'Scannlain, J., dissenting from the denial of rehearing en banc) ("*NWEA II* En Banc Dissent").

I wrote that "the holding in *NWEA II* directly conflicts with the Second Circuit's decision in *Atlantic States Legal Foundation v. Eastman Kodak*, 12 F.3d 353 (2d Cir. 1993)."

*NWEA II* En Banc Dissental, 74 F.3d at 948. This circuit split remains, as the Second Circuit has never reversed itself, and may be a source of ongoing confusion to parties, such as the Port of Tacoma, which reasonably cited *Atlantic States*, in supplemental briefing, for its holding that Congress authorized states to enact standards on wastewater effluent stricter than those mandated by the CWA and federal EPA regulations, but it only authorized enforcement of those stricter standards *by states or EPA, not citizens*.

Indeed, the holding of *NWEA II* substantially altered the regulatory enforcement scheme of the Clean Water Act in a way that was not envisioned by Congress. As I objected at the time:

> "It should go without saying that the environment faces real and growing dangers that warrant protective measures and challenge us to develop innovative solutions. Nevertheless, by allowing citizens to enforce standards that Congress specifically allocated to government agencies to monitor, the court has upset the delicate balance envisioned by Congress in its promulgation of the current enforcement regime for environmental law. The result promises to invite excessive, costly, and counterproductive citizen suits, funded by the taxpayers, for the enforcement of standards that are imprecise and astronomically costly to the municipalities affected."

*NWEA II* En Banc Dissental, 74 F.3d at 946.

This objection is as strong today as it was in 1996. While Judge Miller's Opinion correctly applies *NWEA II* in dealing with the citizen-suit standing issue, I continue to believe that such precedent unfortunately goes beyond what Congress intended.